Continental Automotive Systems Good morning. May it please the court. The board made two claimed construction errors that require remand. The first relates to a pressure measuring device that outputs an electrical pressure signal representative of the air pressure in a related transmitter. The second relates to emittance. The 524 patent is expired, so the Philips standard flies rather than BRI. It must be used to construe the poems. The board's constructions are subject to de novo review. So starting with that first term here, the board's claimed construction analysis did not reach representative or corresponding. Rather, the board focused on pressure measuring device alone, ignored the rest of the language in the claim. The board concluded that a pressure measuring device did not exclude a switch-based device that indicates an anomalous pressure condition. If the claims didn't require anything else, Your Honor, if they stopped after pressure measuring device, the board would be correct. But the claims do require more. The output of the device must be representative of the air pressure. Air pressure is a force per unit area, which is a numerical value. The undisputed plain meaning of representative requires the signal be a portrayal or a symbol of that numerical value, that measured pressure. And an alarm is not a portrayal or a symbol of the measured pressure, and it's not representative. But I understand what you're saying about the claim language, but under Philips we always read it in the context of the specification. Is it not the case that there is at least one embodiment that doesn't deal with this numerical value? No, that's not true, Your Honor. And that's part of where the board went off. And I'm not sure there are two locations in the specification. Well, I'm looking at column 5, lines 1 through 14. Let me turn to that, Your Honor. And I agree, Your Honor, that the key here is that we do need to look at the claims in terms of the specification. Now, I'll note that the board didn't cite to this portion of the specification in support of its construction. But if you look at the specification, earlier in the specification Well, why don't you look at what I'm pointing to here, which is column 5, lines 1 through 14. And it talks about the first alternative, and they say the pressure is continually monitored by a mechanical device, and blah, blah, blah. Why doesn't that deal with something other than the precise numerical value, which you are arguing for on claims? You have to put it in context, Your Honor, of the first alternative. So you have to go actually to start at column 4, line 55. It's talking about the signal transmission from the transmitter to the receiver can be carried out continually or non-continually. The first paragraph in there, 57, column 4, line 57, talks about a situation where the transducer, the measurement device, turns on automatically once per minute and takes a pressure reading and transmits it. So that's the continuous operation. So this is all about when we're going to take pressure measurements. Then it goes into the next paragraph, starting at the bottom there, column 4, line 66, the non-continuous operation. There are two possibilities, and then that's where Your Honor pointed me to, the first alternative at the top of column 5. So in the context here, we're looking at when are we going to take a pressure measurement. And we're talking about trying to extend battery life, as shown here, where they're saying we're going to take it once a minute. We've shown that that can last about five years. So here what this embodiment is talking about is the pressure is continually monitored with a mechanical device. So we're not going to turn it on every minute. We're going to have sort of a range where if it's in that range, we're not going to take any pressure measurements because we don't need to. And then if we get outside of that range, we're going to flip a switch to activate the pressure measurement device, take that reading, and then transmit that representative pressure. And then it continues, Your Honor, to talk about the second mode of the non-continuous alternative. And again, that's one where it's a one-off measurement, where again, the device is not measuring continuously, not taking that minute-by-minute reading and transmitting it. Here, in this second alternative, as Patton explains, there's some sort of an external initiation while the vehicle is stopped. The driver, before he or she leaves for the day or maybe when they're stopping at a delivery location or wherever, wants to check the tire pressure. They do something that initiates that pressure measurement. So this is all about when we're going to take the pressure measurement. What is the timing of the pressure measurement, not how the pressure measurement is taken? That's described elsewhere in the specification. And if you look at where in the specification to describe what that pressure measurement looks like, that's up in the summary or even mentioned in Column 2, where it talks about in accordance with the device of the present invention, a pressure-measuring device is provided which measures the prevailing pressure in the air chamber of the wheel and outputs a representative electrical signal in accordance therewith. Again, that tracks the language of Claim 1, representative electrical signal in accordance therewith. And it talks about three different possible ways to measure that numeric value. One is an absolute pressure. I'm sorry, are you referring to Column 2 now? Yes, I'm in Column 2. I started at line, I don't know the summary of the invention, but I was reading from starting at line 33, Your Honor. But then it describes using an absolute pressure, describes without reference to any surrounding atmospheric pressure, an overpressure reference to the atmospheric pressure, and a difference, all of which are numeric values. So those are the values that the pressure-measurement device is taking and representative of the pressure in the tire. That's what's transmitted. Column 5 is just describing the timing of when these measurements are going to be taken, either continually or non-continually in the various embodiments described there. Why don't you move on to emittance? The Board also erred in emittance, ensuring emittance, Your Honor, in Claim 17. Again, the undisputed definition, plain meaning of emittance, is send out such as heat, light, vapors, having the power to radiate light, heat, et cetera. So it's that, and every single, and again, as Your Honor noted, we have to read this claim in light of the specification. Every single example in the specification talks about a wireless transmission of these signals. But isn't there an embodiment that deals with a non-wireless connection? There is, Your Honor, and it doesn't use the word emit in connection with that embodiment. So certainly you can write claims that are narrower than all the embodiments, and in this case, this claim covers the wireless embodiments. It wouldn't cover the wired embodiment. The Board didn't address this. Really what the Board said is that there's nothing in the specification that limits emit, but what the proper approach, that's coming at it sort of backwards. The question is, what is the ordinary meaning in the context of this specification? And in the context of this specification, the ordinary meaning are the ones that Wasika put forward, which are all wireless examples and wireless definitions, things like radiating power, radiating light, radiating heat. That's how the term emit is used in this specification. We're talking about Claim 17, right? Correct. And so we're just talking about the transmitter. Correct, Your Honor. Something that's internal within the transmitter? Transmitter comprises a detector device? I'm just looking for clarification on what it means when it says, transmitter comprises a detector device which recognizes emittance of a predetermined switching signal. So, Your Honor, what that is talking about. Where is the predetermined switching signal coming from? It's coming from, in this embodiment, from an external source. A valve on the tire? It would not be a valve, Your Honor. It would typically be an electrical signal. So that what you've got here is, you've got the valve and the transmitter and the measurement device are all part of the valve construction. And the onboard computer system is sending a signal to put the device into pairing mode. Or, potentially, you could have a handheld device that would trigger that. But, in any event, what you're doing is you're sending an electromagnetic signal to that device telling it, switch from normal mode into pairing mode so that we can do the handshake. So, in your conception, which item is producing, emitting, outputting the predetermined switching signal? Well, it could be multiple devices, Your Honor, but it could be, for instance, the onboard microprocessor with the antenna, which is located near the wheel. That system could be sending a transmitting, it could be sending that signal, or it could be a handheld device that's sending that signal. What if the claim said, which recognizes output of a predetermined switching signal? Then it would be broad, certainly. Then it would cover the parts of the spec, like column 13? Yes. The mechanical activation? Correct. But since it says emit here, Your Honor, and column 13 is not using the word emit in connection with that device, or that embodiment, it never uses that term. Every use of the word emit is in connection with that wireless type of communication between the device and the tire and the antenna. Is there a discussion in the spec of some item, some device, I guess you called, you said onboard computer or handheld device, that's emitting a predetermined switching signal? Where would that be in the spec? It would be, I don't find it in the figures, Your Honor, here. The device, in a sense, is the... There's something that's producing a predetermined switching signal that a detector device would be recognizing. The detector device is part of the transmitter. So I'm just wondering, where in the figures or the specification is this particular feature discussed? And can you point me to a device that's actually emitting a predetermined switching signal? Your Honor, I think it would be the microprocessor. So if you look at Figure 5, for instance, you've got the microprocessor. There's a corresponding piece of the written description. Figure 5 begins talking about at the bottom of page 7, if that's helpful. Okay. Sorry, Your Honor, I'm having a bit of difficulty finding that right now. I see that my time is... Okay, well, we'll save your rebuttal and maybe when you come back up, first off, you can answer Judge Chen's question. I will. Okay. Thank you. Thank you. All right. Now, Mr. Collins and Mr. Robesky, you're splitting your time, and then Mr. Robesky is retaining the rebuttal time. Okay. So why don't we clock everyone based on the time you've requested. So we'll clock you at 6 and you at 9. Thank you very much. All right. May it please the Court, the two terms I'm dealing with, claim to 1 and 17, Mr. Robesky will be covering the others. And really the question here, a big theme in this case is, did the Board apply a proper Phillips construction or did it make a mistake in engaging in the BRI, Broadest Reasonable Interpretation construction? The Board quite clearly acknowledged it was subject to Phillips. If you look at what it did, it took the two terms for pressure measuring, for example, and it looked at it and went straight to the spec and said, how is that term used? It saw the background section of the invention where the term measuring is used to describe binary type switches. And there was really not much of a dispute below that. It can measure based on the physical position of the floating of the membrane when it hits a certain pressure level, the switch is triggered. The Board also dealt with the corresponding related representative in corresponding terms in describing the signal. The prior art that was discussed talked about what a binary switch emits as a pressure signal, called a measurement signal even. Representative, the claim construction that was offered below, is that it symbolizes or represents, symbolizes, and a 0 or a 1 can symbolize that pressure has reached a specific threshold. Corresponding means in accordance or agreement with, which when you hit that level, it's an agreement with that we have hit the level that we want pressure to be triggered. And that's the way the Board looked at it. That's the construction that was applied. And they did it quite wholly in the context of the specification. The Chief Judge directed Mr. Cain's attention to column 5 of the specification, and 81 of the joint appendix. And I'm wondering if you could respond to what Mr. Cain had to say about that. As I understood it, he's saying this is just talking about timing rather than pressure measurement. That's exactly where I was going with my next words. Okay. Fair enough. No, no, no, no, no. I'm glad we're on the same track. Well, to start off, really what their argument is, is that this binary or more simplistic switch is used in addition to what I would call a quantitative switch, for purposes of distinguishing between the two. Now, the way the spec is constructed is we start off with a background and talk about what is a pressure measuring device. Then they describe in column 4 this quantitative value as one way to practice it. Column 5 starts off with the first alternative. It's an alternative, not an addition to. They're not saying it's an improvement where we take this quantitative switch and add a second switch. This doesn't talk about timing. It doesn't talk about there being two sensors at all. It's not there. And where they reference you to go see how you would build a system like what's in column 5 is to European patent applications. And if you look at them, they're the same binary switch solution that's in the German reference they start off with. So really what they're saying here, and I think the board was correct, was that the board really didn't actually deal with column 5, to be honest. They dealt with the one in the background. But they see right here, this is a specification that discloses binary switches as examples. And there is no, in addition to, there's no disclosure of two switches being used at once. This doesn't talk about timing. It talks about saving battery. And just using a binary switch does save battery. That's true. The other advantages he discussed, they're just not in the specification. Can you move on then to the claim 17 and the word admittance? Absolutely. If there's a plain and ordinary meaning, then you need some sort of disclaimer in this fact. You can't just point to, well, this embodiment references something else, so that's sufficient. So what is your response to your friend's argument? For starters, the plain and ordinary meaning of admittance is to send out. And it doesn't, if you look at the dictionary definitions, they don't say it's wireless. In fact, the dictionary definition they offer uses the current collection within a semiconductor or transistor as an example, which is clearly not wireless. So if we start off with a plain and ordinary meaning, right there in the definition they offer is a wired connection. And the second thing is the way the word admittance is used in the specification, it's quite clear it's not, there's no ever given a special meaning to it, or it says it means this and not that, or a clear disclaimer. In fact, it's used largely interchangeably with the word transmit or transmission. And there's no doubt that you can transmit things over wires. Telephone calls are transmitted over wires. The telegraph is transmitted over a wire. So those terms are used interchangeably. There's nowhere in the specification where the word admittance, even though it is used to describe wireless transmissions, is given a special meaning or someone jumps out and says this means something different. It really means radiate as opposed to send out over some other type of connection, a hardwired medium or something like that. And then you look at the specification and you even see in the examples they give, running from 12 to column 12 to 13, the bottom half of column 12 talks about the sort of wireless way of activating it. And they don't use the word admittance there either to talk about how it's wirelessly triggered. What they do is then they go to the top half of column 13 and they give you examples that are clearly and undoubtedly hardwired. So when you read the term in the context of the specification under ODI, we assume they're trying to cover all their embodiments. There's no clear statement or disclaimer that they wanted to give up those embodiments. One question if I might interrupt because time is somewhat fleeting for you. Sure. I was just about done. The claim says, transmitter comprises a detector device which recognizes admittance of a predetermined switching signal. I think Judge Chen was discussing this with Mr. Cain. But where in your view is the predetermined switching signal coming from? In the prior art I can tell you it's in OSLIN. It's push button 106 sends a signal to blocking circuit 102. And blocking circuit 102 is the detecting device in the prior art, or the detector device. But in this patent, it would be in a read switch. The detector device would be the read switch because it reacts to a magnet being nearby which closes it. Or the mechanical activated switching device, it would be whichever component that receives the circuit closure on the mechanical activation. Okay, but where exactly is it? I'm thinking of the tire and I'm thinking of the transmitter and the receiver and the pressure sensor. Sure. Where is it coming from in terms of those components? In the wireless embodiment, it would be the detector device is going to be inside the transmitter. And you emit a signal to that. From where? You can use either a handheld device. These people walk around in their cars in a tire shop with a handheld device. Or click the valve? You can click the valve. That's a very old way to do it. What you're saying is it's indicative of... Okay. For example, if you look at the Schultz prior art, they talk about a handheld device that sends an infrared signal. That's one way to do it. Another way to do it is to have a high-intensity emitter in the receiver that's in the middle of the car. They all talk to. So the four sensors will talk to the receiver. The receiver can send the signal out. Or it could be a push button like OSLINT. There's a number of ways to do this. And they do disclose basically all of them in their specification. Okay. Why don't we hear from your colleague who I assume is going to do the cross appeal. Good morning. I'll be addressing primarily the cross appeal on Claims 6 and 9. But Judge Shaw, I just wanted to point the court to Column 13 at lines 13 through 16 where it talks about the device being on the valve stem of the tire. And that was I think a question that you had in relation to what the device was. Yeah. So you're saying the signal that the detector is detecting or the emittance is detecting... ...is discussed where you just pointed out at lines 13 through 16 basically of Column 13. Correct. That's one example. All right. I'm sorry. No, no. That's fine. That was what I was looking for. So turning to Claim 6 and its dependent claims, we believe the board committed legal error by using an improperly heightened anticipation standard. And then second, by either rejecting or failing to consider what was uncontroverted, powerful evidence in deciding both anticipation and obviousness. So the legal error with respect to the anticipation standard can be clearly found in both of the board's decisions. The first at A18 where the board states that OSILIN fails to explicitly state that constant frequency was used. And then at A54 in the Schrader IPR required an explicit disclosure. And the board was even a little clearer at A18 of the Continental IPR where the board said it was not persuaded that OSILIN's general disclosure that any modulation scheme may be used anticipates the specific features of Claim 6. There was uncontroverted evidence that a person of skill in the art would understand OSILIN's any modulation scheme, any modulating scheme, to include PSK, phase shift keying, which is constant. It was admitted in the yellow brief at page 18 that PSK was known at the time of OSILIN. It is a constant frequency. And the expert for the abnoner, Andrews, admitted the same at appendix 1264. What if, hypothetically, any modulation means could be so broad that it comprises 50 possibilities of modulating? I know you're talking right now narrowly about phase shift keying versus frequency shift keying. But maybe when OSILIN was talking about using any modulation means broadly, it could be talking about all different kinds of modulations that could be 50 or more different versions. Then in that instance, it's hard to say, wouldn't it, that one of skill in the art, when seeing the term, the very broad generic term, any modulation means in the prior art reference, that one of skill in the art would immediately envisage phase shift keying. In that hypothetical art case, that might be possible. In the Kenna Metal case, there were 31 different possibilities. And yet the court said that there was enough to have one of ordinary skill at once envision these. What we have here are five possibilities, which was laid out in the modern communications reference that was used. That's at A1129 and at A1189 to 1209. Only five. This is like saying if you want to use, let's say, any piece of silverware to eat, one of skill or a person would know I have a fork, knife, and spoon and choose from among those. Here we have five different examples. One of those is phase shift keying. And it's a disclosure that would immediately envision to one of ordinary skill one of these opportunities. It's not 50. It's not 31. It's five. So based on that, we believe that that overbroad standard caused the board to reject or to fail to consider some of the very compelling evidence, such as Mr. Andrews' admissions, that phase shift keying was known. It was known to one of ordinary skill. Constant frequency was known to one of ordinary skill. And Dr. Mercer's rebuttal testimony at A1356 to 57 and 1359 to 60, where he explained why phase shift keying constant frequency was known to one of skill in the art. Could you point me to the part of the appendix which talks about an expert saying when it comes to any modulation means, as that phrase was used in the context of the Osmond reference, you could have only been talking about five different types of modulation. I can point you to A1356 to 57. This is the rebuttal testimony of Dr. Mercer. This is where he discusses at paragraph 46, using any modulation scheme, and says that Osmond explicitly discloses. A1356, right? Yes, Your Honor. Paragraph 46? Paragraph 46, carrying on to 1357, also paragraph 47. That's his rebuttal of Mr. Andrews' opinion in detail. And it's not clear that the board even considered that. As we mentioned, there was really no clear explanation, no persuasive reasoning that this court could clearly review to decide what it was that the board did with respect to this powerful evidence that was before it. So what's the key quote from paragraph 46 you want me to look at? Osmond, you can look. The predicate is maybe achieved using any modulating scheme. That's Osmond. And then he says, thus Osmond explicitly discloses that the oscillator 11 or the transmitter 10 works on a common frequency and could use any known modulation scheme including PSK and FSK. And then it goes on to say a person of skill in the art at the time would understand that PSK uses electromagnetic waves of constant frequency as carrier waves. I think that's pretty clear. If there are no more questions on Claim 6, I'll turn to Claim 9. Claim 9 is a situation where we believe the board adopted a claim construction advocated by Wasika that required the claim to be rewritten. And that revealed one of two errors. Either the claim should have been held indefinite and the IPR proceeding terminated or the board's claim construction is incorrect.  Wasika admits in their brief, the yellow brief at 27, that Claim 9 perhaps could have been drafted more artfully. And that's frankly an understatement. Because the board's claim construction which said that a bit sequence is something requiring two or more bits required the claim to be rewritten to change what was at least a four-bit sequence to actually mean at least an eight-bit sequence or to change the phrase at least a four-bit sequence to mean at least four-bit sequences of two bits each. Did the board say that latter part? The board did not make clear what type of rewriting it would be doing to the claim. I thought the board, I mean maybe I don't remember, but I thought the board simply said based on its reading of the term bit sequence in the claim to always require at least two bits that would be consistent with the phrase at least a four-bit sequence because an eight-bit sequence is certainly comfortably encompassed with the claim language of at least a four-bit sequence. I don't remember the board saying something about potentially rewriting the claim to be at least four-bit sequences. The board did not, but this is what we believe happened. In other words, Your Honor, you properly said that eight is greater than four, but what about between four and eight? At least a four-bit sequence must mean you must have something in between five, six, seven, or eight. And if you rewrite it to say only at least an eight-bit sequence which is what you need to do when you change sequence to two bits, then you've read out of the claim four, five, six, seven. So that's our point. It's not clear what they did. It's clear what the construction was, but the end result, if you interpret it, it's just as I said that it's reading out that portion of the claim. Do you have your experts say anything like in the parlance of data processing arts, people of skill, when they talk about bit sequence, they can use that phrase in a way that can cover just a single bit to convey a certain kind of data? Our expert looked first at the situation where we were trying to interpret the claim according to the way in which we thought it should be interpreted, which means at least four bits. But the best I can tell you for what our expert said, let me see what evidence I can find for you. In his original declaration, it was at paragraph 108. This is A1119, and that's what he said in the petition. Later on, I think one of the key points for the court to consider is that even if the two-bit construction is adopted or considered to be correct by this court, it was clearly obvious to use more than one bit. There was a reference, a Bowler reference, B-O-W-L-E-R, which wasn't even cited or discussed by the court, perhaps not even considered by the board. It's undisputed that that Bowler reference has more than one bit, has several bits for each of the data identifications. But did you put that together for the board in your petition? Where you said, hey, look at Bowler. Bowler, it would be obvious to modify the primary reference with multiple bits. We said it would be obvious to have more than one bit, although our interpretation was they could have single bits. And when in reply, remember there was no patent owner's response, preliminary response, there was a response. And in our reply, we, using the patent owner's interpretation, then put in the evidence of Bowler, which was not considered. And in fact, Bowler was something that if the patent owner wished, the patent owner could have asked for a sure reply, never did. The patent owner did object to consideration of Bowler. The patent owner mentioned Bowler at oral argument. But it was never considered, and it's clear from Bowler and from the testimony of Dr. Mercer. What's the site in your reply brief, your reply? The reply is at page 6. I just have to find our reply. I'm sorry, 6 is the other one. It's at page 13. So it's A442. And we say at the top, even if Wasika's claim interpretation applies, it would be obvious to use a multi-bit sequence for the measured pressure signal or for the preamble or postamble. Exhibit 1018 is Mercer's declaration, rebuttal declaration. Exhibit 1019, that was Bowler. Bowler is in the appendix at 1450. So that's where it was clearly mentioned. Yeah, you got a single sentence in your reply, though. Yes, we would hope it would be enough for the board to read the reference. The reply is limited, and we did argue it at the oral argument. So it wasn't something that the board wasn't aware of. We had slides, we had demonstrative exhibits that brought to the attention of the board of Bowler. And frankly, the issue was not whether one of ordinary skill would think that there could be or it would be obvious to have more than one bit as part of a data sequence. There were Mercer's rebuttal declaration, as I said, as well as the explicit reasons to modify Oslin. That's at A1363, paragraph 58. I see that I'm going into my rebuttal time at this point, so. You've actually taken all of your rebuttal time, but we'll restore two minutes of rebuttal. I think I have reserved five minutes after this. Yes, but you started with 14 minutes, and you've gone through your 14 minutes. I'm sorry. We'll restore three minutes, and in order to keep it even, your friend went over a minute, so we'll give you four minutes in addition to what you have for the appellant. Four minutes for the appellant. Additional minutes. You held on to about six of your rebuttals, so now we'll bring you up to ten. Thank you, Your Honor. So, Judge Chen, to get to your point, in terms of the pairing mode and the operation of that pairing mode in terms of the antenna, there's a discussion at the bottom of Column 9, top of Page 10, Column 10 that gets into that. The clearer one is another embodiment, though, at 12. Column 12 begins at line 46. It talks about it's also possible to use the additional antenna and the additional signal processing circuit as represented by the dashed line in Figure 2 only when the pairing mode is initiated. So, again, it's talking there about the antenna sending a signal, a wireless signal, to the transmitting device in the tire. Is that what that says right there? I mean, I don't see those words that you just said in that sentence that you just read. Well, it has to be read in context, Your Honor, but it's talking about putting the device, if you go higher in that column, starting at line 34, in this case, a signal transmitted to the transmitting device, which is the device on the tire. It talks about that in the microprocessor, et cetera. And then the next paragraph talks about the fact that you can use the antenna to send that signal. If you read over into 13, it also describes the handheld device. You could have a magnet on the outside of the device to close a switch inside the tire, so you could hold the switch there. That would be another way to transmit the signal. So they're giving it a variety of ways, but at 12, the paragraph that begins at 46, I think, gives a pretty clear explanation that they're using the antenna to transmit a signal to. Okay, so I guess you would say antenna, column 12, read contact, column 13, but stop right there. Don't ignore the mechanical activated switching device in column 13 because that isn't encompassed by the word emittance. Correct, Your Honor. Okay. That is our position. With respect to the timing issue, bottom of column 4, top of column 5, again, there's no real dispute, I don't think, Your Honor, that that's exactly what it is. It's the timing of when that pressure is going to be taken. There's been an argument made in the briefing that it didn't make sense to have two separate pressure measuring devices here because you'd use battery, but the whole point is the mechanical switch doesn't use any battery. It's a mechanical switch. It's a membrane floating against the pressure, and only when it closes that switch does it activate the electrical circuit to take a pressure measurement and then output a representative value. Well, I'll be honest. When I read column 5, to me, it looked like the patent was telling me that, as it told the board, that you can use a switch-based pressure sensor to measure the pressure. You're telling me, no, it's really saying it's when you activate the measuring device. But I guess what I ask you is where in column 5 does it say, okay, we're just talking about these European patents solely in the context of when to measure, and then after we've activated the measuring device, now the measuring device is going to go get a number. I mean, where does it say that in column 5? Well, again, it starts on column 4, Your Honor. That's what this whole discussion is. The whole discussion is are we going to operate these, is the pressure measurement device going to operate continuously or non-continuously? And there's a bit of an anomaly because they call it once per minute continuously. But that aside, that's what this is describing. It's describing the timing, and it gives those various things, once per minute. That's one timing scenario. Another timing scenario is when this mechanical trigger or switch is activated. Another is when it's initiated externally by the driver. So all of these tell when the measurement is going to occur, not how the measurement occurs. I guess you've got a list of here are the times when it can occur. It can occur once per minute. It can occur when the mechanical switch is triggered. It can occur when it's externally initiated. So those are all of a kind, and they're all of when, not how or what. So that is, I think that's the way to read this, Your Honor. And it's, again, because if, and really the part of where I think the board got wrong is if you look at the, again, you look at the board's claim construction, they did not even look at representative. They did not look at corresponding. They stopped at pressure-measuring device, and they concluded these mechanical switches are pressure-measuring devices. We agree. I'm sorry. Could you get to the cross-appeal? I want to make sure you have enough time, adequate time, to address both of those issues. Certainly. I think we can get those. With respect to Claim 6, we're talking about no claim construction here, factual findings by the board, standard review is substantial evidence. So the question is, is there substantial evidence supporting the board's conclusion? Phase shift keying is a modulation means. Oslin says any modulation means. So why didn't Oslin disclose a phase shift keying way of doing the modulation, which therefore would be at a constant frequency? What's the problem with that logic? Well, I think a couple of comments on that. First of all, that was an argument first time raised on reply, as we've noted here. The board addressed it, though. The board did address it. And they found that the word any modulating... I mean, first of all, the argument made in the reply brief is sort of the Ken Metal argument, that this is a small genus. You have to, once you know that you're doing some sort of modulating scheme, this is one of them. You have to use it. It would be readily apparent to a person of skill to use it. But as the board found, there's no showing, and there is no evidence in the record this is a small genus. Just the fact that you can go find a phase shifting key versus other types of modulation schemes in the art doesn't mean that saying the word any modulating scheme anticipates. That's, I think, where they fall down on that part. The second part is, as the board rightly noted, on the obviousness angle, they provided no reasoning at all. There's a single paragraph. Can you go back to the first part? Yes. Which was, I guess, the other side made the analogy that this is like picking up silverware. There's a set of well-known limited choices, and that they pointed to, I don't know, maybe a definition somewhere that suggested there's a limited number. There is no evidence, Your Honor, that there's a limited number, and that's exactly what the board said. They've cited no evidence that there is a limited number of choices. All they've said is, the patent shows a couple, and these are well-known. So it's a design choice. This particular one is well-known. That's a design choice. That's not saying they've never done anything to identify what the number of choices might be. So the board rightly rejected that kind of an argument. Can we go to the four-bit sequence problem in the claim? Sure. I mean, to me, at least a four-bit sequence, that's a pretty strong signal that the patentee, or the drafter, is contemplating a sequence that can be four bits. And then the only way you can do that is for each of the four parts of that four-bit sequence to be a single bit. Well, but as the board properly found, these are bit sequences, and it's undisputed that bit sequences are plural, need more than one bit. So in our minds, when we see at least a four-bit sequence in the claim, we should erase the number four from our minds and replace it with eight? I think that what the board said, eight bits is greater than four bits, so there's no inconsistency with the claim language. So we've read four, five, six, and seven out of the claim, right? Well, and as we pointed out, Your Honor, if they had a six-bit sequence, they would have a great non-infringement argument. They would be arguing that. Right, so we have to ignore the embodiment of a four-bit sequence, a five-bit sequence, a six-bit sequence, and a seven-bit sequence. They're not covered by this claim because the claim requires four-bit sequences. Well, it says at least a four-bit sequence, right? Right, it says at least a four-bit sequence, but then it talks about four-bit sequence, in the plural sense, bit sequences, the first bit sequence. So there are multiple bits in each sequence, so since there are four sequences, you get eight bits. And the claim would not cover five bits or six bits or seven bits or even four bits. Okay, you're past your time. We've got one final sentence or statement you want to give us. And so, again, Your Honor, on that one, again, the board, or excuse me, the board properly found that Wasika had not, or excuse me, that the petitioners had not, prior to any articulated reasoning with rational underpinnings, supporting rational underpinnings to make any kind of modifications in the prior art to fall within the scope of these claims. So if no further questions, I would like to thank you. Thank you. First to Claim 6, to the point of the limited number of species, we mentioned in Dr. Mercer's original declaration at A1118, paragraphs 106 and 107, the other modulating schemes and also modern communications, which was cited in Exhibit 1014. It's in our appendix at A1189 and following to 1209. I'm sorry, before you give us a bunch of page numbers, can you quote us exactly what you want us to read? Yes, I will quote paragraph 107, where it says, at A1118, this is Dr. Mercer, and it's at the end where he says, such transmission techniques were well-known in the art at the time of the 534 patents filing. That's a constant frequency transmission technique. Exhibit 1014, and Exhibit 1014 is the modern communications publication. That's the one that lists the five different types of modulating schemes. The only evidence in the record is the page— What page is Exhibit 1014 on? A1189 through 1209. It's in the next volume if you want to turn to that. It is a treatise, a chapter from a treatise. You can see modern communications and spread spectrum. If you go through those pages, you will see identified. The first thing is phase shift keying. It's on 1192. Can you see in the bold heading there? Then it lists the other types of keying, frequency shift keying and the like. All that's in the record is that there were five different types. That was admitted when you're looking for the correlation between the constant frequency and oscillant. It was admitted by Mr. Andrews in his deposition. It's in A1264 where he was asked a question. In fact, oscillant states the result may be used in any modulating scheme. Correct answer, that's what he says. Question, and as you've testified at the time, at this particular time, ASK, PSK, and FSK were all well known. That's correct. ASK and PSK are constant. I'm going to try in 15 seconds to do the other part with respect to Claim 9 and simply say, With respect to Claim 9, the claim is obviously, or I should say clearly, a challenge claim. It has indefiniteness issues. If it's interpreted the proper way, we think there is clear anticipation by oscillant. And if not, it's obvious and there's nothing that said that using more than one bit, using two bits or more, is something that produces a new unexpected or novel result. Thank you. We thank both sides in the case of Supreme.